UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| CANYON FURNITURE COMPANY, | § | |
| | § | |
| Plaintiff, | § | Case No. 5:18-cv-00753 |
| | § | |
| v. | § | Jury Trial Demanded |
| | § | |
| DANIEL RUEDA SANCHEZ, JULIO | § | |
| ALFONSO RODRIGUEZ, FURNITURE | § | |
| INDUSTRIES SERVICES, INC., & | § | |
| DISENOS INNOVADORES de BAJA | § | |
| CALIFORNIA, S. de R.L. de C.V., | § | |
| | § | |
| Defendants. | § | |

## CANYON'S OPPOSITION TO DEFENDANTS' SECOND AMENDED MOTION TO DISMISS

DIAMOND MCCARTHY LLP

Allan B. Diamond
TX State Bar No. 05801800
Rebecca A. Muff
TX State Bar No. 24083533
Brian R. Hogue
TX State Bar No. 24094725
Two Houston Center
909 Fannin, 37th Floor
Houston, Texas 77010
(713) 333-5100 Telephone
(713) 333-5199 Facsimile

Jason P. Fulton
State Bar No. 24040936
2711 N. Haskell Avenue, Suite 3100
Dallas, Texas 75204
(214) 389-5300 Telephone
(214) 389-5399 Facsimile

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES...................................................................................................iii

I.      INTRODUCTION .......................................................................................................1

II.     FACTUAL SUMMARY .............................................................................................1

III.    FACTUAL BACKGROUND ......................................................................................2

        A.      Canyon manufactures furniture in Mexico for sale in the
                United States. ...............................................................................................2

        B.      Rodriguez and Rueda had access to Canyon's trade
                secrets...........................................................................................................2

        C.      Rodriguez and Rueda learned that Canyon was going to
                stop selling furniture to Bob Mills. ............................................................3

        D.      Rodriguez and Rueda form and operate two competing
                businesses while working at the Canyon Baja Plant....................................4

        E.      Defendants market copycat bunk beds to Bob Mills for
                sale in Texas. ...............................................................................................5

        F.      Defendants ship the copycat bunk beds to Bob Mills in
                Texas.............................................................................................................6

        G.      In addition to shipping the copycat bunk beds to Bob
                Mills in Texas, Defendants provide warranty and other
                customer service to Bob Mills in Texas.......................................................7

        H.      Rueda personally handled the sales relationship with Bob
                Mills in 2018. ...............................................................................................7

IV.     LEGAL STANDARD ..................................................................................................8

        A.      Canyon must only make a *prima facie* case for personal
                jurisdiction. ...................................................................................................8

        B.      Legal standard for personal jurisdiction based on specific
                jurisdiction. ...................................................................................................9

V.      ARGUMENT AND CITATION OF AUTHORITIES.................................................10

        A.      STEP 1: Defendants purposely directed their activities
                toward Texas.................................................................................................10

                1.      Defendants purposely directed their activities toward
                        Texas under the stream of commerce test...................................................10

                2.      Alternatively, Defendants purposely directed their
                        activities toward Texas under the Calder "effects" test. ...................................14

                3.      Alternatively, Defendants purposely directed their
                        activities toward Texas under a conspiracy analysis. ......................................17

4.    Alternatively, Defendants purposely directed their activities toward Texas under alter-ego and single-business-enterprise analyses. .......................................................................................21

B.    STEP 2: This controversy arises out of or results from Defendants' contacts with Texas. ..........................................................24

C.    STEP 3: Defendants cannot show the exercise of jurisdiction would be unreasonable. ..............................................................26

VI.   CONCLUSION........................................................................................27

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Arthur v. Stern*, No. CIV.A. H-07-3742,
   *2008 WL 2620116 (S.D. Tex. June 26, 2008)*...................................................................... 17, 18

*Asarco, Inc. v. Glenara, Ltd.*,
   912 F.2d 784 (5th Cir. 1990) ............................................................................................... 8, 9

*Atl. Richfield Co. v. Misty Prods., Inc.*,
   820 S.W.2d 414 (Tex. App.—Houston [14th Dist.] 1991) .................................................... 26

*Berry v. Lee*,
   428 F. Supp. 2d 546 (N.D. Tex. 2006) ................................................................................ 22

*Breckenridge Enterprises, Inc. v. Avio Alternatives, LLC*, No. 3:08-CV-1782-M,
   2009 WL 1469808 (N.D. Tex. May 27, 2009). ..................................................................... 22

*Brown v. Flowers Industries, Inc.*,
   688 F.2d 328 (5th Cir.1981) ................................................................................................. 8

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)................................................. 9

*Calder v. Jones*,
   465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) ............................................ 14, 15, 16

*Caris MPI, Inc. v. Eastman*, No. 3:14-CV-396-N,
   2014 WL 12584417 (N.D. Tex. July 28, 2014)..................................................................... 14

*Casares v. Agri-Placements Int'l, Inc.*,
   12 F. Supp. 3d 956 (S.D. Tex. 2014)................................................................................... 17

*Central Freight Lines, Inc. v. APA Transport Co.*,
   322 F.3d 376 (5th Cir. 2003) ..................................................................................... 14, 15, 16

*Century Hotels v. United States*,
   952 F.2d 107 (5th Cir. 1992). .............................................................................................. 22

*D.J. Investments, Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*,
   754 F.2d 542, 545-46 (5th Cir. 1985).................................................................................... 8

*Delta Brands Inc. v. Danieli Corporation*,
   99 Fed. App'x 1 (5th Cir. 2004). .......................................................................................... 17

*DeMelo v. Toche Marine Inc.*,
   711 F.2d 1260 (5th Cir. 1983) ............................................................................................... 8

*Eagle Metal Prod., LLC v. Keymark Enterprises, LLC*,
   651 F. Supp. 2d 577 (N.D. Tex. 2009). .................................................................... 14, 15, 18

*Enterprise Intern., Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
   762 F.2d 464 (5th Cir. 1985) ................................................................................................. 8

*Freudensprung v. Offshore Tech. Servs., Inc.*,
   379 F.3d 327 (5th Cir. 2004) ...................................................................................... 9, 11, 12

*Gardemal v. Westin Hotel Co.*,
   186 F.3d 588 (5th Cir. 1999) ............................................................................................... 22

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
   466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) ......................................................... 9

*Hernandez v. Frazier*, No. SA-11-CA-9-FB,
   2012 WL 12896486 (W.D. Tex. Mar. 29, 2012), report and recommendation adopted, No. CV
   SA-11-CA-0009-FB, 2012 WL 12895750 (W.D. Tex. Sept. 19, 2012) ................................. 17

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945). ................................................................................................ 9

*Keeton v. Hustler Magazine, Inc.*,
   465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) ........................................ 15

*Luv N' Care, Ltd. v. Insta-Mix, Inc.*,
   438 F.3d 465 (5th Cir. 2006) ........................................................................... passim

*Nat. Dynamics, LLC v. Conquest Int'l, Inc.*, Cause No. A:12–CV–965–JRN,
   2013 WL 12077798 (W.D. Tex. July 3, 2013).................................................... 15

*Nat'l Architectural Prod. Co. v. Atlas-Telecom Servs.—USA, Inc.*, No. CIV.A. 306CV0751-G,
   2007 WL 2051125 (N.D. Tex. July 13, 2007)..................................................... 17

*Nat'l Indus. Sand Ass'n v. Gibson*,
   897 S.W.2d 769 (Tex. 1995) ................................................................................ 18

*Nuovo Pignone, SpA v. STORMAN ASIA M/V*,
   310 F.3d 374 (5th Cir. 2002) ........................................................... 9, 11, 24, 26

*Old Republic Ins. Co. v. Ex–Im Serv. Corp.*,
   920 S.W.2d 393 (Tex.App.—Houston [1st Dist.] 1996, no writ) ............................ 22

*Oswalt v. Scripto, Inc.*,
   616 F.2d 191 (5th Cir. 1980) ................................................................................ 14

*Pacheco v. Dibco Underground, Inc.*, No. A-08-CA-187-SS,
   2008 WL 11334107 (W.D. Tex. Aug. 7, 2008)................................................... 21

*Patin v. Thoroughbred Power Boats*,
   294 F.3d 640 (5th Cir. 2002) ................................................................................ 21

*Religious Tech. Ctr. v. Liebreich*,
   339 F.3d 369 (5th Cir. 2003) .................................................................................. 9

*Revell v. Lidov*,
   317 F.3d 467 (5th Cir. 2002). ............................................................................... 14

*Rolls-Royce Corp. v. Heroes, Inc.*,
   576 F. Supp. 2d 765, 783 (N.D. Tex. 2008) ....................................................... 27

*Shaffer v. Heitner*,
   433 U.S. 186 (1977) ............................................................................................. 24

*Stuart v. Spademan*,
   772 F.2d 1185 (5th Cir. 1985) .............................................................................. 22

*Sw. Energy Prod. Co. v. Berry-Helfand*,
   491 S.W.3d 699 (Tex. 2016) ................................................................................ 25

*Twister B.V. v. Newton Research Partners, LP*,
   364 S.W.3d 428 (Tex. App.—Dallas 2012) .......................................... 25, 26, 27

*United States v. Botefur*,
   309 F.3d 1263 (10th Cir. 2002) ........................................................................... 27

*United States v. Jon–T Chemicals, Inc.*,
   768 F.2d 686 (5th Cir. 1985) ................................................................................ 22

*Universal Sys., Inc. v. HAL, Inc.*,
   500 F.3d 444 (5th Cir. 2007) ................................................................................ 25

*Wein Air Alaska v. Brandt*,
   195 F.3d 208 (5th Cir.1999) ................................................................................... 8

*Wilson v. Belin*,
   20 F.3d, 644 (5th Cir. 1994) .................................................................................. 8

**Statutes**

Tex. Civ. Prac. & Rem. Code Ann. § 134A.004..............................................................23
Tex. Prac. & Rem. Code §§ 17.041–17.045 ......................................................................8

**Other Authorities**

4A Wright & Miller § 106.7 ..............................................................................................26
RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40 cmt. c.)...........................23, 24

## I.  **INTRODUCTION**

Under the Fifth Circuit's stream of commerce test, the delivery and sale of products in Texas subjects Defendants to personal jurisdiction in Texas. Defendants misappropriated Canyon's trade secrets, manufactured copycat furniture using those trade secrets, then sold and delivered that furniture to Canyon's former customer *in Texas*, for sale at retail stores *in Texas*, in competition with identical products made by Canyon and sold *in Texas*. The Court should deny Defendants' Second Amended Motion to Dismiss.

## II.  **FACTUAL SUMMARY**

Between late 2015 and April and July 2018, respectively, Defendants Daniel Rueda and Julio Rodriguez served as key managers of Canyon's manufacturing plant in Mexico. They misappropriated Canyon's trade secrets, money, labor, parts, and supplies. And they used those misappropriated spoils to manufacture copycat bunk beds, virtually identical to those made by Canyon. They made their copycat beds at a nearby Mexican factory they owned jointly (without Canyon's knowledge) called Diseños Innovadores de Baja California, S. de R.L. de C.V ("Disenos").

Disenos and the other corporate Defendant, Furniture Industries Services, Inc. ("FIS"), a California corporation owned by Rueda, then sold those copycat bunk beds to Bob Mills Furniture and shipped them to Bob Mills' distribution center in Texas for sale at Bob Mills' seven retail stores in Texas. And Defendants didn't merely happen upon Bob Mills as a customer. Because they worked for Canyon, they knew that Canyon had recently stopped selling bunk beds to Bob Mills and that the products had sold well.

Each Defendant took specific acts to facilitate sales and delivery of the copycat bunk beds in Texas. FIS communicated with Bob Mills, invoiced Bob Mills, and collected funds for sales made to Bob Mills. Disenos manufactured and shipped the copycat bunk beds to Bob Mills

in Texas. Rueda communicated with Bob Mills on sales, service, and delivery to Texas. Rodriguez funded cash shortfalls for manufacturing costs, using his financial powers at Canyon to secretly wire Canyon's money to FIS to facilitate the sales to Bob Mills in Texas.

For nearly two years, Defendants used misappropriated trade secrets to deliver copycat bunk beds to Texas, for sale in Texas stores to Texas customers. Defendants' consistent, knowing and purposeful contacts with Texas subject them to the jurisdiction of this Court.

## III. FACTUAL BACKGROUND

### A. Canyon manufactures furniture in Mexico for sale in the United States.

Plaintiff Canyon Furniture Company makes and sells furniture. In certain geographical areas, including Texas, Canyon offers its furniture exclusively through Rooms To Go and Rooms To Go Kids stores (collectively "RTG"), which have three locations in Bexar County alone.[1] Canyon manufactures furniture for sale in the United States under a Maquiladora arrangement at an entity called Montecitos Manufacturing, S. de R.L. de C.V, located in Tijuana, Baja California, Mexico (the "Canyon Baja Plant"). Declaration of Micah Goldstein ¶ 4, attached as Exhibit 36 (App. 420-421) ("Goldstein Dec.") & Ex. G to Goldstein Dec. (App. 460-468).[2]

### B. Rodriguez and Rueda had access to Canyon's trade secrets.

Defendants Julio Rodriguez and Daniel Rueda together were involved in the day-to-day operations of Montecitos. Goldstein Dec. ¶¶ 5-6 (App. 421-422). Rodriguez was CFO, and he

---

[1] https://www.roomstogo.com/storelocator/

[2] References to documents introduced as exhibits at a deposition are referred to herein using their deposition exhibit number and the shorthand "Dep. Ex. ____" for ease of cross reference with the deposition transcripts. Other exhibits are referred to using the exhibit number assigned to that item in the appendix filed concurrently with this response, i.e. "Ex. ____." All exhibit citations include a reference to the appendix page number, which is consecutively numbered.

was responsible for the financial operations and accounting of Canyon and Montecitos. Goldstein Dec. ¶ 5 (App. 421). Rodriguez also controlled vendor payment approval, could initiate wires, and make entries to the accounting system. Affidavit of Jorge Perez ¶¶ 5-6, 13, 22, attached as Exhibit 39 (App. 587-589) ("Perez Aff."). Rueda controlled plant operations including the activities of virtually all those responsible for purchasing, inventory, engineering, manufacturing, finishing, packing, and shipping. Goldstein Dec. ¶ 6 (App. 421-422).

Rueda and Rodriguez knew and had access to Canyon's trade secret information, including the models, prices, manufacturing costs, manufacturing processes, vendors, customers and profits associated with Canyon's sales. Goldstein Dec. ¶¶ 5-6, 14, 19 (App. 421-422, 425-426).

## C. Rodriguez and Rueda learned that Canyon was going to stop selling furniture to Bob Mills.

Canyon sells the vast majority of the furniture it makes to RTG. Goldstein Dec. ¶ 3 (App. 420). But in a few cases, Canyon also sells to third-party retailers that do not compete with RTG in specific markets. Goldstein Dec. ¶ 29 (App. 429). Until approximately February 2016, Canyon sold furniture, primarily a children's bunk bed known as the Creekside line, to Bob Mills. Deposition of William Twelves as Corporate Representative of Bob Mills Furniture, attached as Exhibit 42, at 27:15-28:11 ("Bob Mills Dep.") (App. 761-762). Bob Mills has stores in Texas and Oklahoma, and it has a distribution center in the Dallas/Fort Worth area. Bob Mills Dep. at 48:12-49:1, 49:15-16, 102:3-8 (App. 764-765, 773). Canyon stopped selling furniture to Bob Mills, in part because Bob Mills began competing with RTG in the Texas market. Goldstein Dec. ¶ 29 (App. 429).[3] Rueda and Rodriguez knew that Canyon was going to stop selling to Bob

_____

[3] As amended by Declaration Regarding Errata to Unsworn Declaration of Micah Goldstein, ¶ 4, filed on July 30, 2018 (Dkt 13).

Mills. Declaration of Daniel Rueda Dec. ¶ 50, filed Aug. 7, 2018 (Dkt 16), attached as Exhibit 33 (App. 389).[4] Canyon made its final shipment to Bob Mills in approximately February 2016. Bob Mills Dep. at 27:15-28:11 (App. 761-762). But even before then, Rueda and Rodriguez were preparing to appropriate Canyon's sales to Bob Mills for themselves.

**D.  Rodriguez and Rueda form and operate two competing businesses while working at the Canyon Baja Plant.**

Despite their roles at Canyon's Baja Plant, Rodriguez and Rueda secretly formed their own businesses to compete with Canyon. In 2012, they formed Disenos. Dec. of Christian J. Limon ¶¶ 13-14, attached as Exhibit 38 ("Limon Dec.") (App. 535) & Ex. 7 & 8 to the Limon Dec. (App. 559-565); Deposition of Julio Rodriguez, attached as Exhibit 40 ("Rodriguez Dep.") at 20:5-18 (App. 659); Deposition of Daniel Rueda, attached as Exhibit 41 ("Rueda Dep.") at 28:1-12 (App. 709).

Rueda and Rodriguez each initially owned 50% of Disenos, and Rodriguez was the general manager. Rodriguez Dep. at 23:9-24:13, 22:23-23:7 (App. 660-662). Rueda and Rodriguez remained 50/50 owners of Disenos until December 2017. Rodriguez Dep. at 20:5-18, 22:23-23:7 (App. 659-661); Rueda Dep. at 28:18-25 (App. 709); Limon Dec. ¶¶ 15-16 (App. 536); Ex. 9 & 10 to the Limon Dec. (App. 575, 582). In 2014, Rueda formed FIS, a California corporation.[5] Dep. Ex. 31 (App. 167-168), 32 (App. 170), 44 (App. 189), and 45 (App. 191). Rueda was the sole shareholder and officer of FIS until February 2018. Rueda Dep. at 25:17-20 (App. 708).

---

[4] Defendant Rueda has filed four declarations in this action. For convenience, copies of three Declarations are included in the appendix as Exhibits 32, 33 and 34 in support and referred to by their docket entry number in this case, applicable paragraph, and appendix page, *e.g.,* Rueda Dec. (Dkt 10) (App. 375-381).

[5] The business was originally called TCWoodworks, Inc., but changed to FIS in March 2014. *See* Depo Ex. 31 (App. 167-168), Depo Ex. 32 (App. 170).

**E.  Defendants market copycat bunk beds to Bob Mills for sale in Texas.**

In mid-December 2015, just months before Canyon's last shipment to Bob Mills, a person named Dan Ibarra[6] emailed the owner of Bob Mills and offered to make furniture to sell to Bob Mills. Dep. Ex. 33 (App. 172); Rueda Dep. at 59:12-15 (App. 720).  Importantly, Ibarra held himself out as *a representative of FIS*. Ibarra agreed to build and deliver a bunk bed copying Canyon's Creekside bed. Dep. Ex. 47 (App. 193, 196); Dep. Ex. 48 (App. 198).[7]

A few weeks later, in January 2016, Ibarra forwarded Bob Mills pictures of that copycat bunk bed as a supposed sample bed manufactured by Disenos, FIS' Mexican factory. Dep. Ex. 50 (App. 203, 207); *see also* Rueda Dec. ¶ 30 (Dkt 16) (App. 387) ("The bunk beds that are associated with the Defendants were designed and manufactured in Mexico by the Disenos' plant[.]"); Rueda Dec. ¶ 29 (Dkt 10) (same), attached as Exhibit 32 (App. 379). To help Ibarra make sales to Bob Mills, FIS paid for him to have a San Antonio-area phone number. Rueda Dep. at 56:25-57:13 (App.718-719). FIS used this San Antonio, Texas area phone number as its company phone number on all invoices to Bob Mills. Dep. Ex. 34 (App. 174-187); Rueda Dep. at 56:25-57:13 (App. 718-719).

Defendants knew that Bob Mills wanted to purchase copycat bunk beds from FIS to replace the beds that Canyon had stopped supplying. Dep. Ex. 52 (App. 225) (negotiating price at which FIS would sell to Bob Mills based on Canyon price); Depo. Ex. 54 (App. 230) (Bob Mills and FIS discussing timing of purchases from FIS based on remaining Canyon bunk bed

---

[6] According to defendant Rueda, Dan Ibarra is also known as Juan Carlos Paredes. Rueda Dep. at 32:11-25 (App. 712).

[7] In fact, Ibarra was employed by Disenos and worked at its factory. Rueda Dep. at 32:11-18; 32:24-25, (App. 712). Defendants have also conceded that multiple people, including Defendant Rueda had access to several generic company email accounts used by Ibarra and others at Disenos to conduct business on behalf of FIS. Rueda Dep. at 18:9-15, 21:11-19, 22:18-21, 62:14-24, 79:24-80:6 (App. 703, 706-707, 722, 727-728).

inventory); Dep. Ex. 47 (App. 193, 196) (Bob Mills merchandise director asking FIS to build a copy of the Canyon bed); Rueda Dec. ¶¶ 48-50 (Dkt 16) (App. 389). Significantly, Defendants knew that the copycat bunk beds would be sold at Bob Mills stores in Texas. Dep. Ex. 47 (App. 193) (Bob Mills asking "what Texas town is close" to FIS's factory); Bob Mills Dep. at 102:2-14 (App. 773) (Bob Mill had six Texas stores and only two Oklahoma stores in early 2016).

**F. Defendants ship the copycat bunk beds to Bob Mills in Texas.**

Defendants negotiated pricing and then began receiving orders from Bob Mills to buy the copycat bunk beds. Dep. Ex. 11 (App. 143-144). From the first purchase order, Bob Mills requested that the copied bunk beds be shipped to its distribution center *in Texas*. Bob Mills Dep. at 71:5-71:12 (App. 768); Dep. Ex. 11 (App. 143-144); Dep. Ex. 3 (App. 002-112) (Bob Mills purchase orders showing ship to locations in Texas for furniture deliveries, parts often went to stores directly); Bob Mills Dep. 12:15-13:13 (App. 755-758). Bob Mills specifically told FIS that all shipments should be to its distribution center in the Dallas/Fort Worth area. Bob Mills Dep. at 48:19-49:1 (App. 764-765); Dep. Ex. 55, (App. 235) (specifying an initial delivery location in Flower Mound, Texas); Dep. Ex. 20 (App. 163) (informing FIS of a new distribution center location in Fort Worth for future shipments). From the first sale in the summer of 2016 until summer of 2018, Defendants submitted 12 invoices for truckloads of copied bunk beds sold to Bob Mills. Dep. Ex. 34 (App. 174-187). Every one of those invoices shows a "ship to" location of Bob Mills' distribution center in the Dallas/Fort Worth area. Dep. Ex. 34 (App. 174-187). Bob Mills did, in fact, sell the copied bunk beds at its stores in Texas. Dep. Ex. 5 (App. 134); Bob Mills Dep. at 31:3-24 (App. 763), 49:15-17 (App. 765) confirming "the FIS bunk beds were sold in all seven Texas stores"), 102:9-14 (App. 773); Affidavit of Sotero Pastrano ¶¶ 3-6, attached as Exhibit 35 (App. 403); Declaration of Jason Laws ¶¶ 3-7, attached as Exhibit 37 (App. 512-514).

Defendants have also unequivocally and repeatedly admitted in interrogatory responses that they manufactured furniture for and sold furniture to Bob Mills, and that they knew Bob Mills had Texas retail stores. *See* Defendants' August 16, 2018 Response to Interrogatory #1 ("**The only company that has Texas stores that Defendant Disenos sold to was Bob Mills** Furniture LLC. . . . **Defendant Disenos sold the furniture to Bob Mills** Furniture LLC FOB Tijuana, Mexico."), attached as Ex. 29 (App.278) (emphasis added); Defendants' September 7, 2018 Response to Interrogatory #1 ("**The only known company that has Texas stores that Defendant FIS sold to was Bob Mills** Furniture LLC."), attached as Ex. 30 (App. 287) (emphasis added).

**G. In addition to shipping the copycat bunk beds to Bob Mills in Texas, Defendants provide warranty and other customer service to Bob Mills in Texas.**

Defendants also provided sales support to Bob Mills at its retail locations in Texas. *See, e.g.* Dep. Ex. 15 (App. 157-159) (Defendant prepared a sales sheet of talking points advertising the bunk bed for distribution to Bob Mills sales staff); Bob Mills Dep. at 78:19-79:18 (App. 769-770) (sales sheets available at "each point of sale"). When Bob Mills needed replacement parts, service, or other help with the bunk beds, Defendants would send those parts directly to Bob Mills' stores in Texas. Bob Mills Dep. at 98:9-16 (App. 772), Dep. Ex. 13 (App. 146-149), 14 (App. 151-155), 56 (App. 238-241). Rueda also corresponded directly with Bob Mills and would FedEx spare parts to Bob Mills' Texas stores. Dep. Ex. 13 (App. 146-149) (sending parts to Lubbock and Waco); Rueda Dep. at 81:18-25 (App. 729).

**H. Rueda personally handled the sales relationship with Bob Mills in 2018.**

Near the end of 2017, Ibarra apparently departed FIS and Disenos. Rueda Dep. at 33:13-25 (App. 713). After Ibarra's departure, Rueda began communicating with Bob Mills using the same generic company email account, production@furniture-is.com, previously used by Ibarra.

Rueda Dep. at 88:2-89:12, 93:25-94:8, 94:15-17 (App. 733-734, 738-739) (**Question**: "So if the e-mails are signed "Dan" and its after Ibarra left, those are all e-mails from you?" **Answer**: "More likely."). Rueda communicated with Bob Mills to sell copycat bunk beds for delivery to and resale in Texas. *See generally*, emails attached as Exhibit 28 (App. 255-271). During the period that Rueda was directly managing sales to Bob Mills, Defendants invoiced seven shipments of furniture to Bob Mills. Each invoice reflected a "ship to" address of Bob Mills' distribution center in Texas. Dep. Ex. 34 (App. 174-187). In April 2018, Bob Mills asked Rueda to deliver more copycat bunk beds to supply its new store in San Antonio. Dep. Ex. 57 (App. 243); Bob Mills Sep. 85:5-22 (App. 771). Rueda responded to that email personally, Rueda Dep. at 88:2-89:12 (App. 733-734), stating that was "planning to ship [a container]" on April 20 and a second container on May 5. Dep. Ex. 57 (App. 243). Rueda's email referenced a purchase order #159107, a Bob Mills order for copied bunk beds with a "ship to" address of Bob Mills' distribution center in Texas. Dep. Ex. 3 (App. 93), Bob Mills Dep. at 12:15-13:13 (App. 755-756).

## IV. LEGAL STANDARD

### A.  Canyon must only make a *prima facie* case for personal jurisdiction.

When a district court considers a motion to dismiss without an evidentiary hearing, the plaintiff must show only a *prima facie* case for personal jurisdiction.[8] The "Court 'must accept as

---

[8] *DeMelo v. Toche Marine Inc.*, 711 F.2d 1260, 1270-71 (5th Cir. 1983); *Brown v. Flowers Industries, Inc.*, 688 F.2d 328, 332 (5th Cir.1981); *see also Enterprise Intern., Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 471 (5th Cir. 1985); *Wein Air Alaska v. Brandt*, 195 F.3d 208, 211 (5th Cir. 1999) (noting that when the district court did not hold an evidentiary hearing on the issue of jurisdiction, plaintiff need only establish a prima facie case); *Wilson v. Belin*, 20 F.3d 644, 648 (5th Cir. 1994); *Asarco, Inc. v. Glenara, Ltd.*, 912 F.2d 784, 785 (5th Cir. 1990); *D.J. Investments, Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc*., 754 F.2d 542, 545-46 (5th Cir. 1985) (noting that proof by preponderance of the evidence is not required when determining whether personal jurisdiction exists).

true [the Plaintiff's] uncontroverted allegations, and resolve in [its] favor all conflicts between the [jurisdictional] facts contained in the parties' affidavits and other documentation.'"[9]

## B.  Legal standard for personal jurisdiction based on specific jurisdiction.

Exercising specific personal jurisdiction[10] is appropriate if doing so would comport with due process.[11] Due process is satisfied if the nonresident defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"[12]

Demonstrating minimum contacts is a three step inquiry: **First**, did defendant purposely direct its activities toward the forum state or purposely avail itself of the privileges of conducting activities there?[13] In effect, are "the defendant's conduct and connection with the forum state . . . such that [the defendant] should reasonably anticipate being haled into court there?"[14] **Second**, does the controversy arise out of or relate to the defendant's contacts with the forum state?[15] And **third**, is "the exercise of personal jurisdiction . . . fair and reasonable?"[16]

---

[9] *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 343 (5th Cir. 2004) (quoting *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 377, 378 (5th Cir. 2002)).

[10] Plaintiff is not attempting to assert general personal jurisdiction over Defendants.

[11] The Texas long-arm statute extends as far as due process permits. *Religious Tech. Ctr. v. Liebreich*, 339 F.3d 369, 373 (5th Cir. 2003); Tex. Prac. & Rem. Code §§ 17.041–17.045.

[12] *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

[13] *Liebreich*, 339 F.3d at 375; *see also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416-18 (1984); *Asarco*, 912 F.2d at 786.

[14] *Nuovo Pignone,* 310 F.3d at 379 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

[15] *Liebreich*, 339 F.3d at 375; *Helicopteros*, 466 U.S. 408 at 416-18; *Asarco*, 912 F.2d at 786.

[16] *Nuovo Pignone*, 310 F.3d at 378 (citing *Rudzewicz*, 471 U.S. at 474).

## V.  ARGUMENT AND CITATION OF AUTHORITIES

**A.  STEP 1: Defendants purposely directed their activities toward Texas.**

Under several alternative theories, Plaintiff can easily make a *prima facie* showing that Defendants purposely directed their activities toward Texas.

1. *Defendants purposely directed their activities toward Texas under the stream of commerce test.*

Personal jurisdiction exists if a defendant is aware that a product placed into the stream of commerce will reach the forum state.

> **'mere foreseeability or awareness [is] a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce.' We adopted this position in an effort faithfully to interpret *World Wide Volkswagen*, 444 U.S. at 298, 100 S.Ct. 559, which holds that a state does not offend due process by exercising jurisdiction over an entity that 'delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State'.**[17]

Said differently: "Where a defendant knowingly benefits from the availability of a particular state's market for its products, it is only fitting that the defendant be amenable to suit in that state."

The Fifth Circuit's opinion in *Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006), addressed almost identical facts and found personal jurisdiction. Luv N' Care sued Insta-Mix for copyright and trademark claims related to the sale of a copycat baby bottle sold in Louisiana.[18] Insta-Mix had no employees and no agent for service of process in Louisiana, and it conducted no direct sales or marketing in Louisiana.[19] Insta-Mix sold primarily to Walmart, but

---

[17] *Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 470 (5th Cir. 2006) (emphasis added).

[18] *Id.* at 469.

[19] *Id.* at 468.

did not even ship its bottles to Walmart's Louisiana stores or Louisiana distribution center.[20]

Instead, Walmart would pick up the bottles from Insta-Mix's dock in Colorado Springs. And

Walmart's vendor contract "indicate[d] that Wal–Mart assume[d] ownership of the bottles when

they are loaded in Colorado Springs."[21] Insta-Mix learned which distribution center would

receive its shipment only when it completed an electronic purchase order.[22] Ultimately, only

4.5% of Insta-Mix's bottles were delivered to a Walmart distribution center in Louisiana.[23]

Even under these facts, the Fifth Circuit held that Insta-Mix had minimum contacts with

Louisiana based only on (i) the shipment (even by Walmart) of Insta-Mix's bottles to a Louisiana

distribution center, (ii) identification of the Louisiana destination on Insta-Mix's invoices to

Walmart, and (iii) Insta-Mix sending 4.5% of its total units to Louisiana.[24] Defendants' contacts

with Texas are far more systematic and continuous than Insta-Mix's:[25]

- Bob Mills' purchase orders to FIS for the copied bunk beds have a "ship to" location of Bob Mills distribution center in Texas. Dep. Ex. 3 (App. 2-112), Bob Mills Dep. 12:7-15:18 (App. 755-758);

- Bob Mills requested shipment of all copied bunk beds to its distribution center in Texas, Dep. Ex. 11 (App. 144), 55 (App. 235), 20 (App. 163);

- Disenos employees received all Bob Mills' purchase requests and prepared FIS's invoices. Rueda Dep. at 32:3-7, 32:11-18; 32:24-25, 50:13-19, 90:4-7 (App. 712, 716, 735);

---

[20] *Id*.

[21] *Id.*

[22] *Id*.

[23] *Id*. at 468, 472.

[24] *Id*. at 470-73.

[25] To the extent Defendants' interrogatory responses, deposition testimony and declarations contain contradictory statements, the Court must resolve "all conflicts between the [jurisdictional] facts contained in the parties' affidavits and other documentation" in Canyon's favor. *Freudensprung*, 379 F.3d at 343 (quoting *Nuovo Pignone*, 310 F.3d at 378).

- The invoices to Bob Mills acknowledged that all the copied bunk beds would be shipped to Texas. Dep. Ex. 34 (App. 174-177, 179-187); Rueda Dep. at 73:17-21, 91:14-17, 92:4-16 (App. 726, 736-737);

- Defendants knew that Bob Mills had retail stores in Texas. Rueda Dep. at 71:15-17 (App. 725);

- Bob Mills was Defendants' only U.S. customer until late 2017. Rueda Dep. at 38:8-12, 44:11-15 (App. 714-715), Rodriguez Dep. 48:9-16 (App. 675);

- 50% of Disenos' total production went to Bob Mills. Rueda Dep. at 92:24-93:5 (App. 737-738);

- All Defendants' copied bunk beds were shipped to Bob Mills' distribution center in Texas. Dep. Ex. 34 (App. 174-177, 179-187);

- Bob Mills sold half the copied bunk beds it bought from Defendants in its Texas stores. Bob Mills Dep. at 56:15-57:3 (App. 766-767);

- Defendants admitted: "The only known company that has Texas stores that Defendant Furniture Industries Services, Inc. ("FIS") sold to was Bob Mills Furniture." Defendants' September 7, 2018 Response to Interrogatory #1 at 6 (App. 287);

- Defendants admitted: "The only company that has Texas stores that Defendant Disenos . . . sold to was Bob Mills Furniture LLC." Defendants' August 16, 2018 Response to Interrogatory #1 at 6 (App. 278);

- Rueda's sworn declaration concedes that Defendants' furniture was sold in Texas. Am. Rueda Dec. (Dkt 16) ¶ 43: (App. 388) ("They sold in Texas.");

- In 2018, Rueda directly negotiated the sale and shipment of the copied bunk beds to Bob Mills for sale in its Texas stores. Dep. Ex. 57 (App. 829). Rueda Dep. at 88:2-89:12, 93:25-94:17 (App.733-734, 738-739);

- In total, Bob Mills received 12 truckloads of copied bunk beds from Defendants between July 2016 and July 2018, all of which were delivered to Bob Mills' distribution center in Texas. Ex. 34 (App. 174-187) Bob Mills Dep. at 48:19-49:1 (App. 764-765).

Defendants raise predictable objections to jurisdiction, but the Fifth Circuit rejected each

in *Luv N' Care*. Defendants claim[26] to have no control over where their copycat bunk beds were

sold, because they merely took them to the U.S./Mexico border for pickup by Bob Mills.

---

[26] Defendants make numerous factual allegations, unsupported by any evidence, in their Second Amended Motion to Dismiss. To the extent such unsubstantiated claims might contradict Canyon's evidence or are otherwise irrelevant to the jurisdictional inquiry, the Court should disregard them. *See Freudensprung*, 379 F.3d at 434 (holding all conflicts between jurisdictional facts should be resolved in plaintiff's favor).

Similarly, Insta-Mix argued that Walmart had control over the copycat goods once they left Insta-Mix's Colorado Springs dock. The Fifth Circuit rejected this argument, noting that Insta-Mix had filled specific orders bound for Louisiana and sent invoices to Walmart confirming delivery to a Louisiana distribution center. Defendants' invoicing and shipping documentation likewise shows that they filled specific orders bound for Texas, and the same documentation lists Bob Mills' Texas distribution center as the delivery location.[27]

The Fifth Circuit held that because 4.5% of Insta-Mix's total sales occurred in Louisiana, it derived "substantial revenue" from the state sufficient to support jurisdiction. Here, around 50% of the bunk beds Bob Mills bought from Defendants were sold at Bob Mills' Texas retail locations. Bob Mills Dep. at 56:15-57:3 (App. 766-767). And the majority of Defendants' sales were to Bob Mills.[28] This is far greater than the 4.5% of sales sufficient to support jurisdiction in *Luv N' Care*.

Finally, Defendants argue that they merely deliver furniture to the U.S. border, where Bob Mills picks it up and takes title. Insta-Mix made the same argument, claiming that it could not be subject to jurisdiction in Louisiana because its contract transferred ownership to Walmart at Insta-Mix's Colorado Springs dock. The Fifth Circuit rejected that argument: "Jurisdiction . . . 'does not depend on the technicalities of when title passes;' rather, jurisdiction may attach both

---

[27] Relatedly, Insta-Mix argued that its employees did not know the ultimate destination of the bottles. *Luv N'Care*, 438 F.3d at 471. The Fifth Circuit found that claim "implausible" and pointed to the location identified on Insta-Mix's invoices. *Id.* Not only do FIS's invoices to Bob Mills likewise indicate delivery to Texas, but Defendants' regularly emailed Bob Mills about sending spare parts for the copied beds directly to the Bob Mills store locations selling Defendants' copied beds and then FedExed parts to Bob Mills' Texas stores.

[28] Defendants' invoices show that the copied bunk beds were the only product sold to Bob Mills until June 2018. Dep. Ex. 34 (App. 174-184, 187). Defendants also conceded that the copied bunk beds sold to Bob Mills constituted about half their monthly sales from 2016 until 2018. Rueda Dep. at 92:17-93:10 (App. 737-738).

to manufacturers who supply their own delivery systems and to those that make use of the distribution systems of third parties."[29] So too here: transfer of title at the border is no bar to jurisdiction.

   2. *Alternatively, Defendants purposely directed their activities toward Texas under the* Calder *"effects" test.*

   In *Calder v. Jones*, the Supreme Court held that "an act done outside the state that has consequences or effects within the state will suffice as a basis for jurisdiction in a suit arising from those consequences **if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct**."[30] Courts generally use the *Calder* "effects" test to determine whether a defendant's out-of-state acts are sufficient for it to reasonably anticipate being subject to litigation in the state.[31] This test should "be considered as part of the full range of the defendant's contacts with the forum."[32] As the Supreme Court stated, a party "injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California."[33]

   In cases involving intentional torts, the Fifth Circuit has applied *Calder's* effects test to establish personal jurisdiction over defendants.[34] A court may exercise specific jurisdiction under the effects test when (1) the defendant committed an intentional tort; (2) the plaintiff felt the

---

[29] *Id*. at 471 (quoting *Oswalt v. Scripto, Inc.*, 616 F.2d 191, 197 n. 8 (5th Cir. 1980)).

[30] *Calder v. Jones*, 465 U.S. 783, (1984); *see also Eagle Metal Prod., LLC v. Keymark Enterprises, LLC*, 651 F. Supp. 2d 577, 595 (N.D. Tex. 2009).

[31] *Caris MPI, Inc. v. Eastman*, No. 3:14-CV-396-N, 2014 WL 12584417, at *3 (N.D. Tex. July 28, 2014).

[32] *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002).

[33] *Calder*, 465 U.S. at 790).

[34] *See, e.g.*, *Central Freight Lines, Inc. v. APA Transport Co.*, 322 F.3d 376, 383-84 (5th Cir. 2003); *Eagle Metal* 651 F. Supp. 2d at 595 (applying effects test to misappropriation of trade secrets, common law unfair competition, and civil conspiracy claims).

brunt of the harm in the forum, such that the forum is the focal point of the resulting harm to the plaintiff; and (3) the defendant expressly aimed its conduct at the forum, so that the forum is the focal point of the tortious activity.[35]

In *Eagle Metal Products, LLC v. Keymark Enterprises, LLC*, the court held that "the effects test supports jurisdiction over the misappropriation of trade secrets and common law unfair competition claims, as . . . **the focal point of the injury [was] in Texas.**"[36] In that case, the plaintiff alleged that the defendant, who was a nonresident president of a nonresident corporation, had tortiously interfered with the plaintiff's contractual relationships with its customers, committed common law unfair competition, and stole the plaintiff's customer lists and distributed them to the plaintiff's competitors, who then used the lists to solicit the plaintiff's customers. Most of the plaintiff's business was conducted in Texas with Texas-based customers, and the defendant knew the plaintiff was a Texas resident.[37] This was sufficient to show that the defendant's tortious conduct would cause reasonably foreseeable effects in Texas.

Similarly, in *Central Freight Lines, Inc. v. APA Transport Co.*, the plaintiff and the defendant were freight delivery companies that had entered into a contract allowing each firm access to the other's freight lines, to expand the geographical reach of both.[38] The plaintiff, a

---

[35] *Nat. Dynamics, LLC v. Conquest Int'l, Inc.*, Cause No. A:12–CV–965–JRN, 2013 WL 12077798, at *4 (W.D. Tex. July 3, 2013) (citing *Calder*, 465 U.S. at 789).

[36] *Eagle Metal* 651 F. Supp. 2d at 592-96.

[37] That Canyon is not a Texas company makes no difference. A companion case decided on the same day as *Calder* shows that **the most important factor is the location of the defendant's activities**, not the residence of the victim. In *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 772, 778 (1984), the victim of an allegedly defamatory article sued not in the state where she lived, but in a different state. Noting that the defendant had sold more than 10,000 copies of its magazine every month in the forum state, the Supreme Court held that "it must reasonably anticipate being haled into court there." *Id.*

[38] *Central Freight Lines* 322 F.3d at 379.

Texas company, contracted with Dell Computers, also a Texas company, to ship computers from west Texas to the northeastern United States, partly using the defendant's freight lines. The defendant, a New Jersey company, allegedly overcharged the plaintiff under the contract, and the plaintiff brought a tortious interference claim for damage done to its relationship with Dell. The Fifth Circuit found personal jurisdiction over the New Jersey defendant on the tortious interference claim, even though it never picked up freight or delivered freight to Texas, in part because Texas was the primary location of plaintiff's business relationship with Dell Computers, and it was thus reasonably foreseeable that the defendant would be sued in Texas for interference with such a relationship.[39]

Personal jurisdiction over Defendants is appropriate under the *Calder* effects test. **First**, Canyon has alleged that each Defendant committed an intentional tort, including misappropriation of trade secrets, unfair competition, and fraud. First. Am. Pet. ¶¶ 38-91 (Dkt 1-11). **Second**, Canyon has felt the brunt of the harm in Texas, such that Texas is the focal point: due to Defendants' intentional torts, Defendants sold copycat products to Bob Mills ***in Texas*** to Canyon's ***potential Texas buyers*** through RTG. First. Am. Pet. ¶ 30 (Dkt 1-11); Goldstein Dec. ¶ 31 (App. 430).

**Third**, Defendants expressly aimed their conduct at Texas. Defendants admit that at the outset, Disenos and FIS had only one client, Bob Mills, which has seven of its nine stores in Texas. Dep. Ex. 5 (App. 134, 137); Dep. Ex. 6 (App.140-141); Dep. Ex. 13 (App.146-147, 149); Bob Mills Dep. at 49:15-17, 102:3-14 (App. 765, 773); Rodriguez Dep. at 27:6-28:25 (App. 663-664); Rueda Dep. at 38:8-12, 44:11-15 (App. 714-715). Defendants made their copied bunk bed exclusively for sale to Bob Mills. Dep. Ex. 16 (App. 161) (2017 FIS email to Bob Mills stating:

---

[39] *Id.* at 382.

"this group was exclusively made for you"). Rueda knew Bob Mills had stores in Texas. Rueda Dep. at 71:15-17, 81:18-84:23 (App.725, 729-732). Bob Mills advertised the FIS bunk bed on its website as available in its Texas stores. Dep. Ex. 5 (App. 134-138) (webpage stating the FIS bed was available at all seven Texas retail locations), Bob Mills Dep. at 31:7-24, 49:18-23 (App. 763, 765). As discussed *supra* at pp. 10-14, Defendants' actions demonstrate that they foresaw the copycat furniture they made and sold would arrive and be sold in Texas.

   *3. Alternatively, Defendants purposely directed their activities toward Texas under a conspiracy analysis.*[40]

   Although one conspirator's contacts with a forum state are not *automatically* imputed to his co-conspirators,[41] those contacts are nonetheless relevant to personal jurisdiction.[42] District courts in the Fifth Circuit have found personal jurisdiction based on the effects of a conspiracy if the plaintiff shows that the activities of the conspiracy were directed at Texas.[43]

   To establish personal jurisdiction based on a conspiracy directed at Texas, a plaintiff must show that the "likely result" of the out-of-state actions was to cause harm in Texas.[44] The

---

[40] *See* Second Am. Compl. ¶ 115-132. On September 28, 2018, Canyon filed its motion for leave to file its Second Amended Complaint adding conspiracy claims, which form additional grounds for personal jurisdiction.

[41] *Delta Brands Inc. v. Danieli Corporation*, 99 Fed. App'x 1, 6 (5th Cir. 2004).

[42] *Arthur v. Stern*, No. CIV.A. H-07-3742, 2008 WL 2620116, at *10 (S.D. Tex. June 26, 2008) (internal citations omitted).

[43] *See e.g., Nat'l Architectural Prod. Co. v. Atlas-Telecom Servs.—USA, Inc.*, No. CIV.A. 306CV0751-G, 2007 WL 2051125, at *8 (N.D. Tex. July 13, 2007); *Casares v. Agri-Placements Int'l, Inc.*, 12 F. Supp. 3d 956, 968-70 (S.D. Tex. 2014) (plaintiffs established sufficient minimum contacts when they "made a prima facie showing that [defendant] was a 'primary participant in an alleged wrongdoing directed' at Texas residents").

[44] *Hernandez v. Frazier*, No. SA-11-CA-9-FB, 2012 WL 12896486, at *18-21 (W.D. Tex. Mar. 29, 2012), report and recommendation adopted, No. CV SA-11-CA-0009-FB, 2012 WL 12895750 (W.D. Tex. Sept. 19, 2012).

fact that the harm was felt in Texas must be more than merely fortuitous.[45] Accordingly, a co-conspirator's acts are relevant "to the extent the particular facts of the relationship between the parties supports the conclusion that the non-resident knew or should have known that by entering into the relationship he was exposing himself to the risk that he could be haled into court in the forum state."[46]

Here, the relationships between the Defendants show that both Rueda and Rodriguez knew or should have known that by entering into the conspiracy, they would be exposed to the risk of being haled into court in Texas.

Defendants conspired to harm Canyon in an effort to profit from sales of copycat furniture to Bob Mills in Texas. Defendants engaged in wrongful acts to further this aim. For example, starting in April 2017, Rodriguez caused Canyon to make unauthorized "loans" to FIS. Perez Aff. ¶¶ 3-9 (App. 586-588); Rodriguez Dep. at 45:7-15, 47:1-18 (App. 591-597). To prevent discovery of these "loans" to FIS, Rodriguez falsified accounting entries on the Canyon books. Perez Aff. ¶¶ 10-17 (App. 588-589) & Ex. A to the Perez Aff. (App. 591-597). At his deposition, Rodriguez refused to say whether these "loans" were used to fund operations or

---

[45] *See e.g., Eagle Metal*, 651 F. Supp. 2d at 592-96.

[46] *Arthur*, 2008 WL 2620116, at *10; *see also Eagle Metal*, 651 F. Supp. 2d at, 592-96 ("The lynchpin of personal jurisdiction over tort claims is that the defendant can reasonably foresee that it will be haled into the forum state to answer for tortious activity, and the alleged conduct would put [defendants] on notice that they could eventually be held to account in Texas for harming [plaintiff], even if the tortious acts were committed elsewhere."); *cf. Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 773 (Tex. 1995) ("The relationship may be described in terms of conspiracy, but such a characterization should not mask the real facts of the relationship or avoid analysis of the attribution process. The term "conspiracy" is meaningful only to the extent that it helps to elucidate these facts.").

whether money to repay these "loans" came from Bob Mills.[47] Rodriguez Dep. at 67:13-68:13, 68:16-69:24, 70:2-71:20, 71:23-74:9, 74:12-76:14, 76:17-77:13 (App. 677, 678-679, 680-681, 681-684, 684-686, 686-687).[48] Notably, however, Rodriguez testified that he obtained loans to support Disenos, and claimed he and Rueda transferred their interests in Disenos to others without any payment in return. Rodriguez Dep. at 20:11-18, 47:1-18 (App. 659, 674).

Rueda was the owner of FIS, and with Rodriguez, was a 50/50 owner and general manager of Disenos. Ex. 7 & 8 to the Limon Dec. (App. 560, 566); Rodriguez Dep. at 24:9-13, 24:20-24 (App. 662). Rueda had access to the shared email address owned by FIS and used by Disenos employees. Rueda Dep. at 18:9-15, 21:11-19, 22:18-21, 62:14-24, 79:24-80:6 (App. 703, 706-707, 722, 727-728). Rueda engaged in repeated overt acts in furtherance of the conspiracy, including reaching out on behalf of FIS to make sales to Bob Mills in Texas; sending packages of parts to Bob Mills' Texas stores; and directing employees at the Canyon Baja Plant to steal materials and divert them to Disenos. Ex. 1 & 2 to the Limon Dec. at ¶¶ 7-10 (App. 538, 542); Ex. 3 & 4 to the Limon Dec. at ¶¶ 8-9 (App. 545-546, 549-550); Ex. 5 & 6 to the Limon Dec. at ¶¶ 7-11 (App. 552-553, 556-557); Dep. Ex. 57 (App. 243); emails collected at Exhibit 28 (App. 255-257, 267-268, 270).

Rueda knew from the beginning that Bob Mills was a former customer of Canyon, knew that that the reason Bob Mills needed bunk beds was because Canyon had stopped selling the beds to Bob Mills, knew that Bob Mills sold the bunk beds in its Texas stores by virtue of

---

[47] Despite the Court's Order dated August 15, 2018 (Dkt 18), entitling the Plaintiff to take jurisdictional discovery from Defendants, counsel for Defendants repeatedly (and improperly) instructed the Defendants not to answer questions regarding the source of the FIS "repayments" to Canyon, including whether the funds came from payments FIS received in connection with sales of furniture to Bob Mills Furniture stores in Texas.

[48] Canyon intends to move to compel answers to these and other deposition questions.

sending parts directly to Bob Mills' Texas stores, and knew or should have known that the beds were being delivered to Bob Mills' distribution center in Texas. Rueda Dec. ¶ 50 (Dkt 16) (App. 389); Dep. Ex. 34 (App. 174-187); Dep. Ex. 13 (App. 146-149); Rueda Dep. at 60:2-9, 63:5-14, 82:18-25 (App. 721, 723, 730). It is obvious that Rueda knew or should have known that by entering into the conspiracy with Disenos and FIS he was exposing himself to the risk that he could be haled into court in the Texas.

It is similarly clear that by entering into the conspiracy with Disenos and FIS, Rodriguez knew or should have known that he was exposing himself to the risk that he could be haled into court in Texas. Rodriguez, with Rueda, was a 50/50 owner and general manager of Disenos. Ex. 7 & 8 to the Limon Dec. (App. 558-569); Rodriguez Dep. at 24:9-13, 24:20-24 (App. 662). Rodriguez visited Disenos multiple times per week and access to the books and records of Disenos. Rodriguez Dep. at 31:7-20, 42:24-43:3 (App. 665, 669-670). Rodriguez obtained personal loans to pay for Disenos to manufacture copycat bunk beds that were sold to Bob Mills. Rodriguez Dep. at 47:1-18 (App. 674). Rodriguez took multiple steps in furtherance of the conspiracy, including initiating wire transfers from Canyon's U.S. bank account to FIS and falsifying accounting entries to cover up those transfers, which allowed FIS to fund Disenos's manufacturing of the copycat bunk beds to be sold to Bob Mills in Texas. Perez Aff. ¶¶ 3, 7-8 & Ex. A to the Perez Aff. (App. 586, 587-588, 591-597); Goldstein Dec. ¶¶ 32-35 (App. 430-431). Rodriguez also authorized Canyon to pay invoices for Canyon's shipping vendor to take shipments of copycat bunk beds, ultimately bound for Bob Mills' Texas distribution center, from Disenos to the U.S. border. Dep. Ex. 62 (App. 246); Dep. Ex. 63 (App. 248, 253) (showing container #HYUZ362025 shipped to Bob Mills in Fort Worth, Texas but paid for by Canyon); Rodriguez Dep. at 51:13-16, 51:20-52:1 (App. 676-676.1); Goldstein Dec. ¶ 23, Ex. K (App.

428, 498-499, 506); Perez Aff. ¶¶ 18-22 & Ex. B to the Perez Aff. (App. 589, 598, 649); Business Records Affidavit of THS Transport LLC at Invoice #267209 (App. 309, 316), #268605 (App. 319, 324), #270675 (App. 328, 334). Rodriguez knew from the beginning that Bob Mills was a former customer of Canyon, *see* Rodriguez Dep. at 27:6-28:25 (App. 663-664), and, by virtue of his position at Disenos and involvement in the conspiracy with Rueda, Disenos, and FIS, knew or should have known that Disenos was manufacturing copycat bunk beds that were being delivered to Bob Mills' distribution center in Texas for sale in Bob Mills' Texas stores.

The result of Defendants' conspiracy was clearly directed at Texas. The out-of-state actions of Rueda and Rodriguez in furtherance of the conspiracy were made with one goal in mind: profiting from sales of the copied furniture to their largest (and sometimes, only) client – Bob Mills, in Texas. Defendants cannot seriously contend that they are surprised to be brought into court in Texas in connection with those very sales.

> 4. *Alternatively, Defendants purposely directed their activities toward Texas under alter-ego and single-business-enterprise analyses.*

Federal courts "have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation . . . when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court."[49] Although the plaintiff bears the burden of showing that a corporation is the alter ego of an individual, the burden is less stringent in the personal

---

[49] *Patin v. Thoroughbred Power Boats,* 294 F.3d 640, 653 (5th Cir. 2002); *see also Pacheco v. Dibco Underground, Inc.*, No. A-08-CA-187-SS, 2008 WL 11334107, at *1 (W.D. Tex. Aug. 7, 2008).

jurisdiction context than on ultimate liability, and at the motion to dismiss stage, a plaintiff must make only a prima facie case for piercing the corporate veil.[50]

When determining whether a corporation is the alter ego of an individual, courts must examine "the totality of the circumstances."[51] Relevant factors include: (1) whether the individual completely controls the corporation; (2) the level of financial integration between the individual and the corporation; (3) whether the corporation operates with grossly inadequate capital; (4) whether the individual uses the corporation's property as his own personal property; (5) whether the individual uses the corporation to pay personal obligations; and (6) whether the individual acts as if the corporation is an extension of his own personal interests.[52]

Additionally, the single-business-enterprise doctrine is an equitable remedy that applies when, as here, the corporate form is "used as part of an unfair device to achieve an inequitable result."[53]

The operations of FIS and Disenos are tightly intertwined. When FIS received payments from Bob Mills, it would immediately transfer monies to Disenos, which Disenos would then use to pay its workers, utility bills, water bills, and other overhead costs. Rodriguez Dep. at 45:7-46:3 (App. 672-673); Rueda 105:25-106:7 (App. 741-742). Disenos employees performed work for FIS (which had no employees), including communicating with Bob Mills to sell bunk beds in Texas. Dep. Ex. 16 (App. 161), 33 (App. 172), 47 (App. 193), 48 (App. 198), 50 (App. 203), 51

---

[50] *Stuart v. Spademan*, 772 F.2d 1185, 1198 n. 12 (5th Cir. 1985); *Berry v. Lee*, 428 F. Supp. 2d 546, 556 (N.D. Tex. 2006); *Breckenridge Enterprises, Inc. v. Avio Alternatives, LLC*, No. 3:08-CV-1782-M, 2009 WL 1469808, at *5 (N.D. Tex. May 27, 2009).

[51] *Century Hotels v. United States*, 952 F.2d 107, 110 (5th Cir. 1992).

[52] *United States v. Jon–T Chemicals, Inc.*, 768 F.2d 686, 691 (5th Cir. 1985); *Breckenridge Enterprises*, 2009 WL 1469808, at *5.

[53] *Gardemal v. Westin Hotel Co*., 186 F.3d 588, 594 (5th Cir. 1999) (citing *Old Republic Ins. Co. v. Ex–Im Serv. Corp*., 920 S.W.2d 393, 395-96 (Tex. App.—Houston [1st Dist.] 1996)).

(App. 216) & 55 (App. 235); Rueda Dep. at 18:9-18:15, 18:25-19:9, 22:18-21, 31:22-24, 32:11-18, 32:24-25, 70:8-12 (App. 703-704, 707, 711-712, 724); Rodriguez Dep. at 40:32-41:12 (App. 667-668). Disenos employee Daniel Ibarra used FIS email accounts. Rueda Dep. at 18:9-15, 18:25-19:9, 20:1-5, 22:18-21, 32:11-18, 32:24-25, 70:8-12 (App. 703-705, 707, 712, 724); Dep. Ex. 33 (App. 172); Rodriguez Dep. at 41:7-12 (App. 668). FIS and Disenos jointly created the FIS invoices that were sent to Bob Mills, and those FIS invoices listed Disenos employees as the contact persons. Rueda Dep. at 50:13-21 (App. 716) (testifying Disenos created the invoices); Rodriguez Dep. at 33:19-34:4 (App. 666-666.1) (testifying FIS created the invoices); Dep. Ex. 4 (App. 114-132), Dep. Ex. 34 (App. 174-187). The two companies did not keep separate books and records. Rodriguez Dep. at 40:21-41:23, 42:3-12, 43:10-44:2, 44:18-45:6 (App. 667-672). As of December 2017, FIS owned 50% of Disenos; prior to that, Rueda owned 50% of Disenos and 100% of FIS. Ex. 7 & 8 to the Limon Dec. (App. 558-569); Rodriguez Dep. at 20:5-18, 22:23-23:7 (App. 659, 660-661); Rueda Dep. at 28:1-23, 29:18-25 (App. 709-710); Ex. 9 & 10 to the Limon Dec. (App. 570-584).

And Rueda treated FIS as an extension of his own interests. Rueda and FIS share a physical address, and Rueda testified that he was responsible for FIS's financial obligations. Rueda Dep. at 8:17-22, 105:19-24 (App. 698, 741); Dep. Ex. 44 (App. 189). Yet FIS was chronically underfunded, which is why it "borrowed" funds from Canyon (without Canyon's authorization or approval), sought business loans, and was unable, at times, to pay Disenos for furniture sold to Bob Mills. Perez Aff. ¶¶ 3, 7-8 (App. 586, 587-588); Goldstein Dec. ¶¶ 32-35 (App. 430-432); Rueda Dep. at 109:6-8, 111:17-22 (App. 743-744); Rodriguez Dep. at 47:1-6 (App. 674). Indeed, Rueda testified that he could no longer afford to maintain his investment in

FIS; accordingly, he transferred his interest in FIS to others without receiving *any* compensation in return. Rueda Dep. at 104:24-105:21 (App. 740-741).

Likewise, both Rueda and Rodriguez treated Disenos as an extension of their own interests when they were the sole, 50/50 owners and general managers of the company. Rueda Dep. at 28:1-12, 28:18-25 (App. 709); Ex. 7, 8, 9 & 10 to the Limon Dec. (App. 558-584); Rodriguez Dep. at 20:5-18, 22:23-23:7 (App. 659, 660-661). Rueda and Rodriguez completely controlled Disenos from 2012 through 2017. Ex. 7, 8, 9 & 10 to the Limon Dec. (App. 558-584); Rodriguez Dep. at 20:15-18, 22:23-23:7 (App. 659, 660-661); Rueda Dep. at 28:1-12, 28:18-26 (App. 709). Rodriguez took out personal loans to support Disenos, and both Rueda and Rodriguez were individually responsible for Disenos's financial obligations. Rodriguez Dep. at 47:1-18 (App. 674); Rueda Dep. at 105:8-15 (App. 741). But like FIS, Disenos operated with grossly inadequate capital, and at times was unable to pay for labor or electricity. Rodriguez Dep. at 47:1-18 (App. 674). And again, as with FIS, Rueda and Rodriguez transferred their ownership interest in Disenos to others without receiving any compensation in return. Rodriguez Dep. at 20:11-18 (App. 659).

Therefore, it is proper for this Court to impute the minimum contacts of FIS to Rueda and Disenos, of Rueda to Disenos and FIS, and of Disenos to Rodriguez.

**B.  STEP 2: This controversy arises out of or results from Defendants' contacts with Texas.**

Having established Defendants' minimum contacts with Texas, Canyon must demonstrate that its claims arise out of Defendants' contacts with Texas.[54] Canyon has asserted

---

[54] *Luv N' Care*, 438 F.3d at 469, 472 n.14, 473 (quoting *Nuovo Pignone*, 310 F.3d at 378; *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977) (opining that "the relationship among the defendant, the forum, and the litigation . . . [is] the central concern of the inquiry into personal jurisdiction")).

that Defendants engaged in common law misappropriation of trade secrets and statutory misappropriation of its trade secrets under the Texas Uniform Trade Secrets Act ("TUTSA").[55]

Defendants argue (without citation) that since their physical theft of Canyon's trade secrets occurred in Mexico, the mere sale of furniture in Texas is irrelevant, even if such furniture "illegally *used* Canyon's confidential information." Def. 2d Am. Mot. to Dismiss at 11 (emphasis added). But the Texas Supreme Court has rejected this exact argument: "*Use* of the trade secret means commercial use by which the offending party seeks to profit from the use of the secret."[56] And "any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a '*use*'"[57] Thus, Defendants' sales in Texas of furniture using Canyon's trade secrets constitutes a wrongful "use," and such "use" took place in Texas, regardless of where Defendants physically acquired Canyon's secrets.

The Texas Fifth Court of Appeals in Dallas has rejected an identical argument. It held that the marketing and sale of products in Texas that contained trade secrets constituted a "use" that met the "arises from or relates to" requirement for personal jurisdiction.[58] The court rejected the argument that selling a product in Texas was not a basis for jurisdiction where the wrongful acquisition of the trade secret allegedly occurred in another country.[59] The Court of Appeals held

---

[55] Tex. Civ. Prac. & Rem. Code Ann. § 134A.004.

[56] *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 722 (Tex. 2016) (and citing Restatement (Third) of Unfair Competition § 40 cmt. c.).

[57] *Berry-Helfand*, 491 S.W.3d at 722 (quoting *Gen. Universal Sys., Inc. v. HAL, Inc*., 500 F.3d 444 450-51 (5th Cir. 2007) (quoting Restatement (Third) of Unfair Competition § 40 cmt. c.)).

[58] *Twister B.V. v. Newton Research Partners, LP*, 364 S.W.3d 428, 435 (Tex. App.—Dallas 2012).

[59] *Id*. at 437-438 (rejecting theory that because the initial wrongful acquisition of the trade secret occurred in the Netherlands, any later "use" through the sale of products in Texas using the trade secret cannot be a basis for jurisdiction).

that "use" of a trade secret meant "'commercial use' and occurs when 'the offending party seeks to profit from the use of the secret.'"[60]

Thus, under Texas common law and TUTSA, Defendants' sale of and attempts to commercialize and profit from copied furniture in Texas was a "use" of Canyon's trade secrets in Texas, which supports jurisdiction in Texas.

## C.  STEP 3: Defendants cannot show the exercise of jurisdiction would be unreasonable.

Because Defendants had minimum contacts with Texas, the "the burden of proof shifts to defendant[s] to show that the exercise of jurisdiction would be unreasonable."[61] Defendants have not, and cannot meet this burden. The five-factor fairness inquiry examines: "(1) the burden on the nonresident defendant[s], (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies."[62]

First, litigating in Texas would not burden Defendants given that they directly contacted, marketed, sold, delivered, and warrantied copycat furniture to a customer operating seven of its nine retail locations and its distribution center in Texas. It is not unreasonable to ask Defendants to litigate in Texas, where they have availed themselves of the benefit of the state's market for the sale of the majority of their products.[63]

---

[60] *Id*. at 438 (quoting *Atl. Richfield Co. v. Misty Prods., Inc.,* 820 S.W.2d 414, 422 (Tex. App.—Houston [14th Dist.] 1991)).

[61] *Luv N' Care*, 438 F.3d at 473 (citing *Nuovo Pignone*, 310 F.3d at 382).

[62] *Luv N' Care*, 438 F.3d at 473.

[63] *Luv N' Care*, 438 F.3d at 474.

Second, Texas has interests in protecting the use of trade secrets within its borders and in addressing economic injury occurring in Texas as a result of misappropriated trade secrets.[64] Further, "where a product allegedly causes economic injury in [Texas], it is in the interest of that state to have its courts mediate the dispute."[65]

Accordingly, the Court should find that Canyon has made a *prima facie* case for personal jurisdiction. The Court should continue forward with the preliminary injunction hearing.

## VI. CONCLUSION

Defendants manufactured copycat furniture using Canyon's trade secrets, then sold and delivered that furniture *to a predominantly Texas retailer*, for sale to *Texas customers in Texas*, in direct competition with identical products made by Canyon and sold *to Texas customers by another Texas retailer in Texas*. Under Fifth Circuit precedent, Defendants' conduct is more than sufficient to support jurisdiction over Canyon's trade-secret claim. This Court should proceed to hear Canyon's motion for a preliminary injunction.[66]

---

[64] *See, e.g.*, *Twister*, 364 S.W.3d 428 discussed *supra* at pp. 25-26.

[65] *Luv N' Care*, 438 F.3d at 474.

[66] The Court may assert pendent jurisdiction over the remaining claims, because they arise from the same nucleus of operative facts. Or it may defer its jurisdictional ruling on those other claims. *See Rolls-Royce Corp. v. Heroes, Inc.*, 576 F. Supp. 2d 765, 783 (N.D. Tex. 2008) ("once a district court has personal jurisdiction over a defendant for one claim, it may piggyback onto that claim other claims which arise from the same facts") (citing *United States v. Botefur*, 309 F.3d 1263, 1272-73 (10th Cir. 2002)); *see also* 4A Wright & Miller § 106.7 (explaining pendent personal jurisdiction: "a district court has discretion to exercise personal jurisdiction over a claim that it ordinarily lacks jurisdiction over only when that claim arises out of the same common nucleus of operative fact as does a claim that is within the in personam jurisdiction power of the court").

Dated September 28, 2018       Respectfully submitted,

DIAMOND MCCARTHY LLP


  */s/ Jason P. Fulton*
Allan B. Diamond
TX State Bar No. 05801800
Rebecca A. Muff
TX State Bar No. 24083533
Brian R. Hogue
TX State Bar No. 24094725
Two Houston Center
909 Fannin, 37th Floor
Houston, Texas 77010
(713) 333-5100 Telephone
(713) 333-5199 Facsimile
adiamond@diamondmccarthy.com
rmuff@diamondmccarthy.com
brian.hogue@diamondmccarthy.com

Jason P. Fulton
State Bar No. 24040936
2711 N. Haskell Avenue, Suite 3100
Dallas, Texas 75204
(214) 389-5300 Telephone
(214) 389-5399 Facsimile
jfulton@diamondmccarthy.com

Counsel for Canyon Furniture Company


## CERTIFICATE OF SERVICE

    I hereby certify that on September 28, 2018, a true and correct copy of the foregoing instrument was served on all parties via the Efile Service.


*/s/ Jason P. Fulton*

28